Okay, we are going to hear our next case, which is Small v. Welldyne. And, Mr. Pitts? Yes, sir. Happy to hear from you. Thank you, Your Honor. Good morning. Good morning. My name is Marshall Pitts, and this is my colleague, Mr. Willie Gilbert. We represent the plaintiff, Michael Small, in this matter, on behalf of his mother, Bertha Small, who is the decedent. Today, I will be out speaking solely primarily on proximate cause and also contributory negligence, whereas Mr. Gilbert will be addressing the remaining claims, breach of the warranty, partial summary judgment, our vicarious liability issues, and also our request for reassignment to a new judge if the court deems that these cases were being remanded back to the district court. As it relates to, as you're already aware, this case involves a misdelivery of six medications to Bertha Small, who we allege ingested a portion of those medications, and at that time, they led to her personal injuries and ultimately to her death. Now, I want to address what I believe is the most significant issue coming out of this case. The district court decided that if a company forwards you, misdelivers medications to you in a package addressed to you, and the medications inside that package are in prescription bottles that are not marked or labeled for you, and you inadvertently ingest those medications, you are negligent as a matter, contributory negligent as a matter of law. And we think that portion of the decision has far-reaching implications and will affect millions, potentially millions of consumers at a time when we as a country are going in a different direction where when it comes to prescription drugs, we're trying to provide more protections to our consumers. This case does just the opposite. But isn't that somewhat of a map? First of all, the order doesn't necessarily, I mean, it seems like there's an error with the order on the contributory negligence so that you point out that it is relying on the testimony of Shirley, the daughter, that Ms. Smalls had been warned where I think the record suggests that warning came the day after the pills arrived and the day after the testimony of Mr. Michael says she ingested them. So I get that issue. But putting it aside, is the holding necessarily that broad? Isn't the holding, given the context here, when the patient, for lack of a better word, when Ms. Smalls receives telephonic warnings and didn't receive it this time, that here it could be, when you don't even look at the label, a contributory negligence? Well, there's several reasons, Your Honor. First of all, the court, although it talked about Shirley Small, it doubled down. When it mentioned Rosemary Chaponda as being the primary care physician of Ms. Small, who indicated that she had been prescribed three of these medications previously and that she would be familiar with those and that kind of thing. Yeah, but when you look at the record, those are in 2010. I actually went back and looked at the pharmacy records, and when those prescriptions were prescribed was three years and four years before this, and she didn't say that in her affidavit. Her affidavit was a bit vague. Right. Well, my point being that when they talked about the court doubled down on its issue back to the pill bottles being clearly marked, it talked about Rosemary Chaponda, but it disregarded that and said, nevertheless, the pill bottles were clearly marked. And we dispute, first of all, that the pill bottles were clearly marked. If you look at the pill bottles themselves, they had about 17 different pieces of information on those bottles, so we dispute that particular. Isn't that regulated by the FDA, how you label a prescription drug? Well, it may be regulated, but to a geriatric patient who is 74 years old, we believe that's a jury issue to determine whether she actually was reasonable for her to know what was going on as far as those pill bottles were concerned. Well, that's a good question and one I had. But isn't the standard, you talk a lot about her age and her education, but isn't the standard what an ordinary care, the standard for ordinary care, the care that an ordinary prudent person would exercise under the same or similar circumstances? Right. So is that standard a general objective standard, or is it something that's peculiar to your client's education level? No, it's a general objective standard. But we assert today, Your Honor, that there were factors here that were ignored that should have gone to a jury. For instance, you had three different doctors who indicate that when a person is familiar with a pharmacy, a trusted pharmacy that they've received mail-order medications for for a number of years, that it was certainly reasonable for them to believe that medications that are sent to them in a package addressed to them would be reasonably intended for them. And you had not only our two experts, you also had an expert from Exactus Pharmacy, I mean a pharmacist, who also said on the phone when the small family called this person to say, you know, we've got these pills here and our mom's in the hospital, and they go through the litany of what was in the medications, and they said, and Matthew Menz, I believe his name, said, well, if she received those packages in the mail through medication and it was reasonable, she should have expected those pills to be her pills. And so that... I think the question he's asking is, doesn't the ordinary consumer look at the label on the prescription drug to see who prescribed, who the prescriber is, and what the name of the brand or the generic is, and perhaps even the dosage? Don't they, before ingesting one of the pills, don't you at least look cursorily at the label to make sure that some mistake hasn't been made? Well, Your Honor, as I said before, that's one factor to be considered, but for the court to determine as a matter of law that a person, that that's contributory negligence without considering other factors that may have been in play, we believe is an error for the court to assume that. Isn't there a case on this from North Carolina, that Champs convenience store, which I believe your colleague cited in their brief, but the opinion they cited was subsequently overruled by the North Carolina Supreme Court. And anyway, this is where the wrong chemical gets delivered to the store for cleaning, and the label says it's a toxic chemical, but the delivery suggests, no, no, this is the thing you always use to clean your floors. And so without looking at the label, they clean the floors. They can tell from smelling it, this sure smells like poison, but whatever. The delivery guy told us it's the regular thing. They clean the floor. The store is terribly damaged. And the North Carolina Supreme Court says that's a jury question. Whether they were entitled to rely on the delivery or whether they had to read the label, that's a jury question. So why isn't that pretty much on point here? I think it is on point. We are arguing that a jury should be allowed to hear these facts and evidence that are presented in this case. And for instance, when you have, like I said, even more so than that case because you're talking about a one-time incident. This is not a one-time incident with Ms. Small. Ms. Small was receiving her medications in the mail for years in the same type packaging, these gray plastic mailing envelopes. She dealt with well-dyed defendants for a significant period of time. And so there was a history there, an established history, not just a one-time incident where this is the first time I'm receiving this medication, so let me double-check everything and make sure it's correct. And as our experts dictated, she then had a reasonable expectation by the history that they had together that these medications that were put in this mailing package delivered to her doorstep were reasonably intended for her. Can I stop you about that expert testimony? I have two follow-ups. Judge Harris brings up the case that I've spent some time with too. I think it's a good issue. Is CHAMP's convenience really on point there? I'm sure they had discussions that same day. So wasn't the reasonableness of not looking at the label greater in a situation where, say, I got a problem, I'm calling, and a couple hours later it comes, compared to a situation where every other time with the prescription meds there had been a call in advance confirming the delivery was coming? So that's one point. Now I'll ask you a second one, which is with respect to the experts that you talk about, I'm not sure what field that's in, and I'm not sure what level of reliability is at all associated with that as it relates to the Daubert standard. Now I realize I don't think there was a Daubert motion on that point, but it sure seems like it's reasonable because I say so sort of opinion. Well, let me address your last point first. As far as our experts go, both of these gentlemen, Dr. Simonson is a board-certified geriatric pharmacist. He's been doing this thing for 40 years. His opinions are directly related to what we have at issue here. And then you have Dr. Baker who also sat on different boards and stuff that make determinations as far as pharmacies, what they do distribute, what types of medications they distribute. So I don't know how we could have found anybody else more on point as to this type of case. And again, back to your point about the paint sealing thing, you're talking about the same day, but again, we're talking about a young woman, a geriatric patient who has had an extended history of dealing with well-dying, the defendants in this case, without incident. Also, she has no prior history at all of abusing her medications or misapplying her medications in any way. It just so happens on this particular occasion, they send her the wrong medications, which she would never have expected or at least a reasonable jury could determine that her conduct over the history of what they've experienced together was reasonable. We're asking that this was a jury issue. We believe it was a jury issue and not something that should be ruled on as a matter of law. Counsel, thank you. You have some rebuttal time. Mr. Gilbert, we'd be pleased to hear from you, sir. Good morning, Mr. Court. Lee Gilbert for the appellant, Michael Small. Your Honor, I did want to briefly touch on an issue that Mr. Pitts wanted to touch on, and that was as to the proximate cause. Can you speak up just a bit? I want to make certain that I hear you. Yes, Your Honor. There is one issue that Mr. Pitts was going to address that I want to make sure we didn't miss, and that was the issue of proximate cause where the district court found that there was insufficient evidence that Mrs. Small actually consumed the medications. I think the record is replete with both direct evidence and circumstantial evidence that she consumed that medication when it was received by her. There was an eyewitness. Her daughter's living boyfriend saw her take the medication, and then our experts opined that circumstantially the physical symptoms that she exhibited after consuming those medications substantiated a finding that there was some evidence that she did, in fact, consume those medications. Thank you. Are you going to talk about proximate cause as it relates to the death? I can do that, Your Honor. That was going to be Mr. Pitts' area, but if there are any questions in that area, we believe that our expert testifies. Either one of you, it would be either Mr. Pitts on rebuttal or you now. I'd like to hear one of you talk about the proximate cause issue. Okay, I'll let Mr. Pitts do that then on rebuttal. If that's okay, Your Honor. I'd like to address the district court's dismissal of the claims against exactness on the grounds that liability for well diner misdelivery could not be imputed to exactness. We believe the district court erred in that regard for three different reasons. Number one, exactness expressly assumed liability for any negligence that may have resulted from services that were delivered pursuant to the agreement between well diners and exactness for well diners to deliver these medications. We point that out in our brief. Second, we believe that well diners clearly was acting as exactness' agent in this particular matter and that as exactness' agent, any negligence that well diners committed would have been imputed to exactness under theories of agency. There was some question about whether there was sufficient evidence to establish an agency, but the district court did not find that there was any question that well diners was acting at the behest of exactness. It found that there was not sufficient control by exactness over well diners' actions to meet the second problem of the agency examination. We believe that the evidence is more than sufficient to establish myriad ways in which exactness controlled the manner in which well diners was to provide these services to justify a finding that well diners was acting as exactness' agent when it misdelivered these medications to Ms. Small and that there was therefore sufficient control to establish this agency. Thirdly, we believe that exactness and well diners are engaged in a joint venture. We've pointed out in our brief why we believe that, but there was clearly an agreement between exactness and well diners to engage in this business venture of delivering prescription medications by mail. In fact, both companies, exactness and well dinerics, are engaged in the prescription mail order business. It just so happened that in this particular instance, for this particular customer whose order was being fulfilled, exactness asked well dinerics to fulfill that particular order for exactness. In other words, it stood in exactness' place instead. This was done pursuant to the well dinerics pharmacy agreement, the recital for which specifically and expressly indicates that both parties are entering into this agreement to provide mail order services, prescription mail order services. Does it matter? I mean, I understand your arguments there. Is there, other than having another defendant, is there a particular advantage of having exactness in the case? You have a defendant who you claim to be directly involved in the wrongdoing. I know that's on appeal, obviously, but if we were to say there's a question of fact about that, what does having exactness do for your case other than having just an additional defendant? Well, I think it helps the jury understand the relationship between the parties, and yes, it does secondarily add a second defendant into the case for liability and collection purposes if there happens to be a verdict in favor of our client. And then fourth, the reason why the dismissal of the claims against exactness was erroneous is because we had direct claims of liability against exactness not just for imputed liability but for their own negligence in this particular case. So I may have to rephrase what I said, Judge Qualdebaum. There is actually a separate and independent basis for liability against exactness that we have alleged in our complaint. The district court found that exactness did not have a duty in this case to our client's mother, because they did not have a prior relationship with her, and that the order to ship the medications from exactness to Willa Deinerichs was to ship those medications to a different person, but that they were misdelivered, and therefore, according to the district court, there was no duty that exactness breached when that occurred. We believe that they did have a duty to our client just on basic negligence principles to ensure that they do not create harm to other people by their actions, and we've alleged numerous ways in our complaint how we allege that they did, in fact, breach that duty. So we think that for those four reasons, the district court— I'm sorry. You think that quite apart from sort of vicarious liability for Willa Deinerichs' conduct, exactness has direct liability in this case to your client? Yes, Your Honor. Yes, Your Honor. Okay, and why? What was wrong with the district court's reasoning, which was effectively, well, they didn't do anything to your client? Yeah, well, the district court said that exactness did not owe a legal duty of care to our client because it did not have a relationship with our client, that they didn't— that exactness did not order that the medications be shipped to them. Right. The fact of the matter is— And they didn't ship the things to your—they neither ordered that the pills be shipped to your client nor shipped the pills to your client. That's correct. So what did they do? Well, they did a number of things. We've alleged in our complaint. The first thing that they did is when they took the order from the woman in California that was supposed to be filled, they took it. She had ordered Terozocin, and when they transposed that order and sent it to Weldinerix, they directed Weldinerix to fill it with—fill the prescription with levothyroxine. That's not what the client wanted. So there was an error there by exactness' own hand in misprescribing or misdirecting the medicine to be delivered. Further, once that error was made, exactness failed to discover that they had made that error. Exactness also failed to timely discover that Weldinerix had made the shipping error in this case. And they did not have any procedures or systems or mechanisms in place to timely discover or correct shipping errors and dispensing errors that might occur. And there's plenty of evidence in the record, should we get back to the trial court, to prove up that lack of systems and mechanisms to detect and correct shipping errors. So those are just a few of the bases for direct liability, Judge Harris. Thank you. I don't have much time. In fact, I think I'm over my time. If I could just make a couple of more points, Your Honor, and then I'll— All right. Can you do that quickly? I'll give you some extra time. Certainly, Judge Wilkinson. We believe the district court should have granted us our partial summary judgment motion. Weldinerix admitted that their misdelivery of medications to Ms. Small was a negligent act. That negated the existence of a genuine issue of material fact on the issue of the breach of duty of care by Weldinerix. And we believe we should have been entitled to partial summary judgment against Weldinerix on that basis. And that liability should have been imputed to exact this as a result of the agency and the other imputed bases for liability. And then finally, Your Honor, should there be a reversal in this case, which we believe the evidence supports, we would ask that the case be reassigned. There were a number of statements and exchanges by the district court judge below that we felt betrayed a bit of bias and prejudgment of the facts in the case. And we also believe that there was an exchange during the summary judgment hearing that was sort of uncalled for and exhibited some hostility that we still don't have particular answers for. We believe that given the way that the district court resolved the summary judgment and the number of the analytical errors that it made, the prejudgment of the case that it had, and the prior relationship with defense counsel, we believe that the district court may have significant difficulty putting out of its mind previously expressed views and findings that it has made to justify the decision that it did make in this case. And we think that cleaning the slate and bringing on a different judge would be the best way to preserve an appearance of fairness and justice for our clients. Thank you, Your Honor. Thank you. Ms. Bearer. May it please the court. Good morning, Your Honors. I'm Demetrius Bearer, appearing on behalf of the Well-Dine-Appleese Collective team together with its actives. It is the Appleese position that the order for summary judgment by the district court was correct in this case, that there is no genuine issue of material fact, and we respect the request that this court affirm the lower court's decision. The first issue I want to look at is that of contributory negligence. In North Carolina, contributory negligence acts as a complete bar to a negligence claim or to implied warranties. And we believe in this case that there is actual evidence that the decedent, Ms. Small, acted carelessly or reckless, not recklessly, but acted carelessly when she received the medication. You can see there was negligence on the part of the defendant. Yes, Your Honor. Well-Dine inadvertently shipped the wrong medications to the wrong patient. So what I would like to ask you is when we talk about contributory negligence and we talk about the reasonable person standard, does a reasonable person standard, a lot of times these pills go to people who are seniors and are of advanced age and are suffering from various incapacities and disabilities. And is that the reasonable person we're talking about or is the reasonable person that we're talking about just the overall population, irrespective of age? Your Honor, Well-Dine would contend that the standard here is a reasonable person. It is not a subjective standard. So in this case, the appellants are trying to make the standard subjective just to look at the decedent's age, whether or not the decedent was illiterate and the decedent's past medical condition. But the standard by case law is what a reasonable, prudent person would do to exercise care in similar and same circumstances. So in this case, the appellant is arguing that you should ignore that the decedent received a package that contained medications that were plainly labeled for another person that had another physician on each model of the medication and none of the medications had been prescribed specifically to the decedent. There's nothing in the record to show that any of those six medications have been prescribed to the decedent's birth response. So when you're talking about recipients being elderly members of the population, sometimes, and I know doctors complain about this with all kinds of patients, is sometimes people get confused about which medications they should be taking and at what intervals they should be taking them. And a lot of patients are taking, you know, seven or eight different medications a day. And so do you need to take that into account when you decide these cases? I believe the point that I believe you're making, Your Honor, is that's exactly the reason why an ordinary person has a duty to look at the medication bottles before they consume the medication because you have to know what you're taking, how you're taking it, when you should take it, and how it should be consumed. And a reasonable, prudent person, be it a geriatric patient or a young patient or just a patient that's ill and sick and needs medication, reasonably will look to see how I should be consuming this medication. It makes me a little bit nervous. I just shouldn't rely on our own personal circumstances. But I remember the terrible toothache, and I couldn't stand the pain. And I went to the pharmacy, and the pharmacist handed me the bottle with one pill in it and said, take this. And I swear, I did not look at that label. I just chugged it down. I mean, am I not entitled when the pharmacist hands me the thing and says, take this pill? So two questions. Would that be contributory negligence? And if not, are these maybe distinguishable? How broad is the principle you're asking for? I think in the scenario you just raised, Judge Harris, that would be contributory negligence on your part. So you are sort of agreeing with your colleague. The rule you are arguing for is not context-specific. It is sufficient that any person who doesn't check the label before they take the pill, no matter what the circumstances, has been contributory negligent. And you understand the district court to have issued that ruling. Yes, that's my understanding, Your Honor. And another thing I want to point out. Just to follow up on that, I'm sorry, but is that a rule that's limited to prescription drugs? Because Judge Harris talked about the Champ's Convenience Store earlier, which had a label for chemical things, which also have dangers. So is it a prescription drug rule you are asserting? I wouldn't say it's a prescription drug rule, but I think when you're looking at a case as in the Watson case, which is an unpublished decision, when you're talking about a claim of wrongful death and you determine whether or not the person's own negligence played a role in it, it is reasonable and warranted in that case to decide on summary judgment standard whether that person was contributory negligent. So do you think if the employees in that Champ's Convenience Store had actually died, then if they had died, then it would have been, as a matter of law, they really should have checked the label because, man, they died. But because they didn't die, it was a question for the jury? I'm relying on the case law in Brown v. Duke Power. It says, in an action for wrongful death predicated on negligence, summary judgment for a defendant is correct where the evidence establishes contributory negligence on the part of the decedent. And that is exactly what we contend happened in this case, that it is negligent. I understand the principle of law you just announced. I absolutely understand, but it seems to beg the question. We're talking about whether there was contributory negligence here as a matter of law. I entirely agree that in a wrongful death case, if there has been contributory negligence, then you can't recover. But so what do you do? And this goes back to Judge Cronenbaum's question with this Champ's Convenience Store case where the employees failed to look at the label which announced clearly this is a toxic chemical. They could smell that it was off. They knew that there was plenty of evidence that they were using the wrong chemical. They didn't look at the label, and the Supreme Court said, well, that's a jury question. Your Honor, I believe the distinguishing factor from the Champ's case in this case, if you're looking at the history here, that the protocol was that when the medication No, no, you can't look at the history because you answered my question by saying none of the surrounding circumstances matter. What you are arguing for is a per se rule that whatever the surrounding circumstances, even if the pharmacist is telling you right now take this pill, you're not allowed to rely on that. And if that's right, I would like to know how you can distinguish Champ's Convenience Stores. Your Honor, I think the best way to distinguish it is on the factual basis, Your Honor, and look at the facts that were at play in each case. So are you retracting what you said to me? You're changing your mind on whether the surrounding circumstances matter. Your Honor, I think what I'm trying to say is that you have to look at the facts that are not in dispute to determine whether or not contributory negligence should apply in a summary judgment ruling is what I would try to articulate, Your Honor. And in this case involving Bertha Small, she received six bottles of medications that were plainly not labeled for her that went contrary to the usual protocol. This chemical smelled like nothing they'd ever smelled before. They were like, God, this thing smells terrible. And it's my understanding in the Champ's case, that was the first time that those individuals were using that particular chemical. They knew it smelled wrong. Somehow they knew it smelled wrong. They had bought the store from somebody else and was relying on a prior history. In this case, we're looking at the specific knowledge, what Bertha Small knew or should have known, and she should have known that when you receive bottles of medications that you should review the medication to determine how it should be consumed, when it should be consumed, and whether the medication is for you. Those are good arguments. They sound kind of like jury arguments the more you're getting to the facts and the circumstances. You know, in terms of where we are as an appellate court, it would seem to be there's either a—for us to take a look at it, there'd need to be either a duty that is a kind of standard duty or not something that causes you to look at the circumstances quite as much as you're doing. I thought you were going a certain way, but it seems like you're making a good closing argument that maybe not a matter of law. No, Your Honor, I'm not making a good—I'm not trying to make a good closing argument. The point that I'm trying to make is if you look at the facts that are not in dispute, it is not disputed that the medications arrived to Ms. Bertha Small's home. It is not disputed that she consumed the medications, if you look in the light most favorable to the appellant, the non-moving party. And under those circumstances, that seems to be actual evidence of contributory negligence, and there is not a genuine issue of material fact as to any of those issues that I just stated, Your Honor. Can I—before you sit down, we've had a lot of discussion on the contrib part, which is important, but on the proximate causation, the district court ruled as a matter of law this, the death was too attenuated from the taking, ingesting the wrong medication. And, yeah, proximate cause is typically a jury question, and they have expert testimony that links the death to the medications. Now, I don't think there was a Dahlberg challenge to that opinion, and I'm not sure it's about, quite frankly, how that would stand up to a Dahlberg challenge, but given the order that we have, is there not evidence in the record that would make proximate cause a question for the jury? Your Honor, we will contend that it's not. Two of the motions that were denied as being moved to concern the motions raised by the Welldown defendants to exclude the experts of Baker and Simonson because their opinions were based upon assumptions, speculation, or conjecture because the alternative theory is looking at all the evidence in the case. But they weren't based on this proximate cause. They were based on the absence of evidence that she ingested the drugs, which came in the form of a witness who was disclosed, just not deposed or otherwise had given testimony prior to the close of discovery. At the time they rendered their opinion, there was just interrogatory responses to that witness. There was not an affidavit that person had not been deposed. So none of the experts had any evidence as to what had been consumed by Ms. Bertha Small, the amount, whether it was the drugs that were related to lowering the hypertension. Each expert for the plaintiff made an assumption that that was the case, but there was no factual basis for them to make that assumption because they both agreed. Dr. Simonson admitted in his deposition that he did not know what had been consumed by Bertha Small. I'm sorry, Your Honor. Oh, I'm sorry. I just wrinkled my eye. But I just want to make sure I understand the posture. The district court did not exclude these experts under Daubert. The district court said, I'm looking at the reports, and I still think there's not enough to go to a jury. Yes, Your Honor. You might have a Daubert motion pending if we were to send this case back. I understand that. But I guess I don't understand the basis for the district court's decision that if you look at the expert reports as well as the other evidence in the case, there's not a jury question on causation. I mean, there is evidence in the case that she took the medicine. There's the expert report saying if she took this medicine would cause this outcome. They also had inferred from circumstantial evidence that her symptoms were consistent with the medicine, so there was additional evidence that she had taken it. So why is that not a jury question? Judge Harris, as you pointed out, there's the allegation that she took the medication, but there is no factual evidence as to which medication she consumed, how much of it she consumed. And when they talked about her symptoms being consistent, the one thing that Dr. Simonson talked about was immediately within one hour she would experience hypertension or her blood pressure would be severely lowered. There are no medical records that any of the experts pointed to to show that that basis, from what she formed his opinion, was present in the record. So if you look at the fact of the absence of what she took or what she consumed, and then that was on or about November 19, 2013, and the death took place six weeks later, and the death certificate says a number of things which do not mention medication or the improper use of medication but refer to a urinary tract infection, pneumonia, a myocardial infection, but we believe it should have been an infarction, and some other things. And so it would appear that Judge Bull had- Can I ask exactly what the nature, what medications were these that we are talking about? We've been talking about medications in very general terms, but I'm interested in what the specific medications are. Yes, Your Honor. The medications, to my knowledge, there were three medications that were to treat hypertension, and that was the medication consistent of the siminbastin, the HCCT. There was lisperil. There was also leprosy. There were three different medications for hypertension? Three of the six were supposed to treat hypertension or had the effect of lowering blood pressure. And so one of the assumptions made by Dr. Simonson is that Bertha Small took one of each of those three medications which had the effect to lower her blood pressure, then to make her to be confused, then to cause her to fall, the snowball theory. But there's no evidence in the record that she consumed any of those three medications. Well, except that her- things happened to her that were very consistent with your blood pressure going way down. I mean, you may- look, it looks to me like the district court read that and was like, well, I don't- that doesn't make a lot of sense to me. I'm not terribly moved by this expert's opinion, but that's not for the district court judge to decide. It's up to the jury to decide whether that holds water or not. Your Honor, the district court judge looked at the facts of the case, which were not in dispute. There is no evidence of any medical record that the non-moving party can point to to show that that actually happened. That Bertha was lowering the blood pressure, which led to the other symptoms, Your Honor. So you think it is undisputed in this case that she did not take those three pills? That is an undisputed fact that we can- I believe, Your Honor, that there is no evidence that she did take any of those three medications. So that means that she took pills, right? Yes, Your Honor. Okay. There's evidence, if you look at the facts, and most favorable to the plaintiff is Michael David, who said he saw her take some medications, but he also said, I don't know what she took, I don't know when she took it, the date she took it. There's no actual evidence that she took any of the three medications. Well, why wouldn't taking pills that could have been three of the six, combined with symptoms that are consistent with taking any one of the three, be maybe weak evidence, but evidence in the record from which a jury could conclude that? Why wouldn't those be something that, again, you may have a great case, but one that at least has evidence that she took the pills? Your Honor, I understand the argument that you could look at circumstantial evidence, but in this case, there is actually no evidence of the symptoms they said that she would have experienced. There's no evidence that she suffered a dramatically low blood pressure at or about the time that this medication was delivered or presumably taken between the 19th and the 27th. What we do have is undisputed evidence that these medications arrived at her doorstep and that they were addressed to her. The outside layer, you're correct. And what happened after that, you know, seems to me a little bit vague, but why isn't it a permissible inference? Would it be a permissible inference for the jury to draw that once the medications entered the home that they would be ingested? Because they had been many times in the past. Somebody could say, well, these are my medications and just put them in. I'm not, you know, we don't often grant judgment as a matter of law on a contributory negligence claim. And I think that's because in a contributory negligence claim, and certainly that is true in this posture, that the negligence is conceded. And it should have been, because you have to be very careful with what you're sending people through the mail. And particularly when we know that seniors consume a disproportionate number of prescription drugs, you have to be super careful because you're dealing with a vulnerable section of our population that you want to bend over backwards to protect and make safe. And to just say, well, contributory negligence is a matter of law, that's the end of it, isn't it? There's so much we don't know. I mean, because the problem was created by your client. The whole problem originated with your client. I agree, Your Honor. You know, it's serious business. And part of the function of tort law is deterrence and deterrence of careless behavior. And don't we stand a better chance of deterring large companies who produce and mail order these pills than we do of deterring the thousand upon thousand people who consume them? And what I'm saying is if you think that deterrence is a basic function of tort law, and it is certainly one of the functions, isn't the utility of deterrence best directed at the folks who conduct this activity in bulk and are best able to monitor it and to proceed carefully? This is, you know, this is my concern. I certainly understand your concern, Your Honor, and I agree that there is a deterrence factor. And any company such as WellDineRx or a large mail order company, certainly their number one goal is to provide and distribute medication safely, which is the reason why they have policies, procedures, and protocols in place. And if you look at the, I think it was the million of prescriptions that are prescribed, the rate percent error was 1% or less, Your Honor. So they certainly understand the severity of what can happen if the medications are in the wrong hands. But that does not negate that an ordinary prudent person has a duty to take and exercise reasonable care, which would include looking at medications received to determine if they're for you, what they are, how they should be consumed, and when they should be taken. And you don't have to look at anything other than the plain label of the bottles in this case to decide that there is actual evidence of contributory negligence. And in North Carolina, there is, although unpublished case law, where a person took their own medications negligently and summary judgment was upheld as being appropriate as a matter of law. And in this case, you have an individual that took medications that were not prescribed to her. So our time is over. I do apologize. Thank you, Your Honors. Thank you, Counsel. Mr. Cobb. May it please the Court. My name is Barry Cobb, and along with my colleague, Suzanne Walker, I represent the appellee Xactus Pharmacy Solutions in this case. Summary judgment was properly granted to Xactus by the district court because Xactus had no legal responsibility for any error in shipping the medications received by Ms. Small, and because the uncontroverted evidence shows that a reasonable person in Ms. Small's position should have realized these medications were not intended for her and should not have taken them. The facts with regard to Xactus's relationship with Welldone are that Welldone provided what's called pick, pack, and ship services for Xactus. Xactus had customers around the country that it arranged for the shipping of prescriptions to, and then delegated through this contract, this pharmacy agreement, to Welldone the responsibility for gathering those medications from its inventory, Welldone's inventory, packaging them or filling prescriptions, putting them in the bottle. What you're saying is none of this precludes you from arguing these precise facts to the jury. I don't understand that, I mean, normally you get an instruction on anything that you have evidence where there's evidence to support the instruction, and so if we were to send this back, it wouldn't preclude you in any way from arguing what you've just argued to us, and I'm sure the district judge who is willing to rule for your favor in a matter of law would at the very least give you the instruction on contributory negligence that is supported by what you say. Yes, sir, Your Honor. If I could talk about agency for a few minutes first, and then I'll come back to the contributory negligence argument if I could. With regard to Exactus and the contention that Exactus was the principal for Welldone and is therefore legally responsible for Welldone's negligence, our contention there is that Exactus did not exercise sufficient control over Welldone to be responsible for anything that Welldone did in this case. In fact, the facts show that Exactus sent accurate information about its customer, SD, to Welldone that upon receipt of that accurate information, Welldone sent back a confirmation to Exactus saying we are sending the medications you told us to send to your customer, SD, in California, and we're sending it with this UPS tracking number, those medications have gone out. At that point, Exactus had never heard of Bertha Small. Ms. Small was not its customer. Ms. Small had no prior dealings with Exactus of any kind. Ms. Small had no relationship of any kind with Exactus. The very first time Exactus heard anything about Mrs. Small was when her son called and said these medications have come to my mother. I'm sorry. She's in the hospital. Would you not be arguing if Ms. Small had been your customer? I can see how that would affect your direct liability, but how does that affect whether or not you have a principal-agent relationship with Welldone? I don't understand the relevance of whether or not she's a customer to that argument. You're right, I think, Your Honor, if I understand the question correctly. The primary significance of her not being our customer and us having no relationship with her is that we did nothing wrong personally that would cause this problem. Right, but I thought what you were arguing right now was that you don't have a principal-agent relationship with Welldone. Is that not what you're arguing? Step two of that is that once we have sent correct information to Welldone, we don't control anything that they do in the way that they pick, pack, and ship these drugs. And that would be true even as to your own customers? That would be true even as to our own customers. So even if Ms. Small was a customer here, you would still be arguing we don't have a principal-agent? We can't be held precariously liability? That is correct. Now, the distinction that might be true in that case that's not present here is that if we sent information to Welldone and Welldone sent the wrong stuff to our customer, we have a relationship with that customer. You'd be maybe directly liable. Exactly. But you still wouldn't have an agent-principal relationship. Precisely. That's our position. Yes, Your Honor. And I'm sorry if that wasn't clear previously. No, no. I just wanted to make sure I understood. So the contract specifically provides what the responsibilities of Exactus and Welldone are in this process of gathering the information, providing the information to Welldone, having Welldone pick, pack, and ship the medication to the customer. Welldone pick, pack, and ship this medication to the wrong customer. We argue we have no direct liability, and we argue that we didn't exercise sufficient control over Welldone's pick, pack, and ship functions to be responsible as a matter of agency for that negligence either. And therefore, we contend we shouldn't be held responsible on agency theory. I do want to address one thing that Mr. Gilbert talked about, which is he said that there was an assumption of liability in the contract, and that's simply not true. Page 2477, Volume, I think this is Volume 2 of the record, is Prescription Verification Support Agreement, which is a subsequent and subsidiary agreement that is not the primary pharmacy agreement under which these medications were shipped. That does contain an assumption of liability provision. That does not apply to the activity that was involved in this case. So we contend we have no direct liability. We contend we have no agency liability. We also contend that there was no joint venture, that there is simply no evidence in the record of any sharing of profits between these two parties. Scalia You basically want us to slap an independent contractor label on the whole relationship? Welldone We do, Your Honor. The contract says so. The contract says that they're independent contractors, the two parties. It specifically provides for that in the contract. Your point is that there's insufficient evidence of a joint venture. A joint venture or control. Or an agency relationship. Yes, sir, Your Honor. Yes, sir, Your Honor. And as a result of that, we contend. No, there's certainly the direct relationship in the actual mailing was between Welldone and the plaintiff. That's correct, Your Honor. They were the ones in charge of mailing. That's correct, Your Honor. Not only that, but they gave us. And to the extent there's an argument that we had a general responsibility to the public based on tort law, well, we carried out that responsibility by getting back a confirmation that said these medications are going to the person you asked us to send them to. Welldone sent us that. We asked for that. We got that. We got that confirmation. And yet the medications didn't go where they said they were going to go. So even within the independent contractor framework, you did what you could to protect yourself? We believe so, Your Honor. We think that we have no legal responsibility by direct negligence, by agency, or by joint venture for any negligence by Welldone. But I thought you were making beyond the point about how we characterize the relationship. You did what you could to make certain that there were no misfirings in terms of the mailings. That's correct, Your Honor. That goes, I would argue, to whether or not there's any direct negligence by us. Did we do the things that were appropriate for us to do to try to make sure that Your view is that unlike Welldone, there's no underlying concession of negligence at all here. That's correct. It doesn't rise or fall. That's correct. Okay. We believe we did what we were supposed to do, and we believe that we're not legally responsible for anything that Welldone did not do that it was supposed to do. That's our position in the case. And with regard to the contributory negligence, and I see my time is short, so I won't talk about this a lot, but I do want to raise one distinction that I think is really important in this case. Unlike in the Champ's case, the specific contributory negligence that the defendants talked about in this case is that these medications did not have Ms. Small's name on them. We're not talking about a difficult interpretation of instructions. We're not talking about taking two pills when you should have taken one and following through that. We're talking about these pills didn't have her name on them. How is that different from like you think you're using Mr. Clean on the floor, but if you look at the label it says poison? Because if there's anything that everybody ought to know about prescription medications is you don't take them unless your doctor tells you to. So you're saying there's a different rule that applies to prescriptions because you're ingesting something into your body? Is that the difference? I think that makes a difference. I think the other thing that makes a difference is that I do believe that there are factual distinctions that make a difference. I'm not sure that you can say that unless you follow everything that's on the label 100% of the time, it's contributory negligence as a matter of law. Whose name was on the actual bottle? The customer in California, Ms. SD, her name was on the bottle, on each one of these six bottles of medication. Her name, her address, her doctor's name, all of that stuff was on this bottle. We're all a completely different person. Yeah, that's correct. That's correct. Related to that, this is just a narrow question, and it may be something that the other side knows. The pictures that are part of the Joint Appendix 269 have the package, have two pictures, one that has the address of Ms. Smalls. Of course it was sent there, we know that. Then there's a bottom picture on that same page that lists Ms. DuBois, I think. Did that bottom picture go to Ms. Smalls? Do you know what I'm talking about? I'm not sure I know what you're talking about, Your Honor. So what I do know is that there's a label on the outside of the envelope that was directed to Ms. Smalls. Right. Inside that there was a box, and inside the box there were pill bottles. Yeah, I know about the bottles. There's a bottom picture that has Ms. DuBois' name that looks like some packaging, and I couldn't tell. I'm not sure of the answer to that question. Okay, thank you. I apologize. Thank you. Mr. Petsch, you have some rebuttal. Thank you. Very briefly, Your Honor, as it relates to approximate cause, Ms. Berry indicated that there were no symptoms exhibited that could be directly related to the consumption of these pills. But if you look at the conversation between the exactus pharmacist and the small family on the phone that's in the audio file, he asked them, well, what pills did she take? And they gave him the answer. He said, well, if she took those, she's going to go into septic shock. You go to her hospital records when she was admitted on November the 22nd, primary diagnosis, septic shock. And so when you look at the other things that were related to her symptoms, they're implying that you don't have to have, you can't prove something by circumstantial evidence. You can do it by direct evidence and circumstantial evidence to create a genuine issue of fact in this case. Clearly, in this case, we believe there's a plethora of circumstantial evidence as well as direct evidence from Michael David that he saw Ms. Small ingest some medications. Now, when you talk about the symptoms that she exhibited from a circumstantial standpoint, Ms. Small had never had any problems with hallucinations prior to these pills arriving, had never had any problems seeing dead people, had never had any problems with hypotension. Dr. Baker and Dr. Simonson mentioned that in their records. This was something that was not ever part of her history. So how is it coincidentally that right after these pills arrived, she starts to experience things that she had never experienced before, and specifically the hypotension, which when it drops your blood pressure that low, can have detrimental effects on people her age. And so back to the attenuating circumstances, Judge Boyle's decision said it was too far removed. Well, Judge, Dr. Simonson and Dr. Baker both talk about that. When you're talking about elderly patients, once their blood pressure goes down to that extent, it's a typical symptom of them breaking their legs or breaking major bones. And we all know we don't need a doctor to tell us this. I'm sorry, Judge. You're asking that we adopt a rule that says it's never contributory negligence as a matter of law, even when another patient's name is on the pill bottle? Your Honor, I would say it should be a very rare instance, but I don't think this is that instance. Let me just ask you this. What factors in this case would lead you to say that this could be a narrow ruling? Understanding that you might prefer a broad ruling, fine. But are there factors that would be short of a holding that it's never an absolute holding, that it's never contributory negligence as a matter of law if you take a prescription drug, even though another person's name is on the container? Your Honor, I cannot sit here and say there's never a circumstance where that would occur. But I can say in most instances, because, first of all, contributory negligence is very rarely, as you know, given as a ruling, as a matter of law. And with those limited circumstances, particularly as you're talking about such dangerous instrumentalities put into the stream of commerce, I can't think of a situation that would be appropriate to rule as a matter of law if somebody ingested medications that were sent to them in error and they inadvertently ingested those medications without considering the surrounding circumstances that have occurred. So there's no limiting factor? Well, I'm saying I can't think of anything right now as a limiting factor. I think that it is always prudent in those situations to look at the surrounding circumstances that led to the ingestion of the medications that were not designated as law. Does the age of the patient or the particular disability of the patient enter into a determination? Well, as far as facts and circumstances, but I would also say that we talked about this. Is this a general rule, objective standard? We're not asking for a subjective standard specific to— You can have an objective standard that takes account of relevant circumstances. So would a reasonable person in Ms. Small's position, in a wheelchair, at her age, infirm, have checked the label or not? That is an objective standard. It's not subjective, but it takes account of circumstances. And I don't know the answer as to which approach North Carolina applies. Do you? Well, Your Honor, up to this point, the cases that we've reviewed, they still consider the reasonable person to be—to take into effect there's age, all those types of things in determining whether they have acted reasonably or not. What's the case that said that? It seems to me if that's the case, you got a different— you got an enormous number of standards that would potentially apply. You got a teenager standard. You got a 20-year-old standard. You got—I mean, I thought it was a reasonably prudent person, and there were some exceptions if someone had disabilities. And so if you're arguing the client is disabled, I think that creates, as I read the law, a different situation. But I don't think you're arguing that. No, no, Your Honor. We're arguing that the standards is a reasonable person standard. And then when you determine whether a person is acting reasonably or not, you consider all the factors that were in play at that particular time. And also, Your Honor, I would also want to go back and address— there's been a lot of talk about Shirley Small and her giving warnings. Well, we, again, we didn't get any inference on that as well. The judge, the district court, gave her full faith and credit as to everything that she said. When there was—in other words, it's not uncontroverted. We had situations. We had affidavits. We had inferences that tended to show that Shirley was not necessarily credible. Even by her own testimony in her deposition, she admits she has poor memory. She admits that she has learning disability challenges. She said all of these things. And back to your question about the no call before the drugs were to come, there was a specific questioning about that from Ms. Berry. She asked you, did you ask your mom whether or not she had confirmed a phone call for delivery of that second package? Well, we just thought it was a normal thing because it was normal. My question was, did you ask your mother? No. Whether or not she confirmed? No. Did you think anything differently because there had been a phone— not been a phone call prior to confirming that? No, I didn't think anything differently about that. Counsel, let me ask you one additional question. Yes, Your Honor. What about other courts around the country? These are questions of state law. How many cases are there out there on misdirected prescription medications? We have not, and I'm not saying— Is this a first? I'm not saying we're the most proficient legal researchers in the business, but we have been unable to find a case that rules as a matter of law, that a person is contributory and negligent for ingesting medications from a package that was labeled to them. Are there cases coming out the other way? I mean, has this issue arisen? Not that I'm— Okay. Not that I'm aware of, Your Honor. All right. So we believe— Is this— I'm sorry, Your Honor. Are we saying that these cases rarely arise or at least they've rarely been reported? They've been—apparently they've been— Maybe they settle out. Right. Apparently. They're very—I think most of the time, we're being the exception, I think most of the time there's a misdelivered medication, there is a resolution prior to it getting this far. I think that's typically what happens because drug manufacturers— I can imagine there would be situations where a company would not want to go for a jury with a misdirected— Right. But there are very few reported decisions on this, you say? Yes. Yes, Your Honor. Like I said before, I think for the reason we just stated, that's probably why. But, again, we have been unable to find anything that says as a matter of law you are contributory negligent if you fail to read or if there's assumed evidence that you— Yeah, and I think you've put your finger on the reason for it. Right. Right. Good question. I mean, I don't want to get in a dialogue, but there are cases. There's California law, and I'm not here to debate. But I agree that it's very limited law. I was somewhat surprised about that. But, yeah. And, Your Honor, I would also say that— I think Judge Harris had a question. I'm sorry, Judge Harris. It was a fraudulent interview. I didn't mean to— No, I'm fine. Okay. Anybody else have— All right. Does that conclude? Yes, Your Honor, that does conclude what I have to say, I believe. All right. We'd like to thank you, and we will adjourn court and come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Pamela A. Harris, A. Marvin Quattlebaum Jr.